## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| MARVIN HAYNES, <br><br>          Plaintiff, <br><br>      v. <br><br> CITY OF MINNEAPOLIS, and Sergeants DAVID MATTSON, MICHAEL KEEFE, PATRICK KING, GERHARD WEHR, and Lieutenant MICHAEL CARLSON, in their individual capacities, <br><br>          Defendants. | **COMPLAINT & JURY DEMAND** |

Plaintiff Marvin Haynes, by and through his attorneys, the law firms of Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, and Magna Law Firm, LLC, hereby alleges as follows:

### INTRODUCTION

1.      Marvin Haynes spent almost two decades wrongfully imprisoned for a crime he did not commit: the May 16, 2004 murder of Harry Sherer in a North Minneapolis flower shop.

2.      Haynes, who was only 16 years old when he was wrongly arrested, was ultimately exonerated in December 2023 with the consent of the Hennepin County Attorney. The Hennepin County Attorney acknowledges that Haynes was actually innocent and that the prosecution was based on police overreach; she describes it as "egregious" and a "terrible injustice" that should never have happened.

3.      No forensic or physical evidence ever connected the innocent Haynes to the crime. He was excluded as the source of fingerprints believed to be left by the shooter at the scene.

4.      The evidence used to prosecute and convict Haynes was all the product of misconduct by Minneapolis Police Department (MPD) officers: Sergeants David Mattson and Michael Keefe, partners who led the homicide investigation from the day of the shooting through trial and conviction, partner Sergeants Patrick King and Gerhard Wehr, who assisted in the investigation, and Lieutenant Michael Carlson, who supervised.

5.      When the key eyewitness, Sherer's sister Cynthia McDermid, initially identified a filler, who had been in another state at the time of the crime, as the shooter, Defendants knew McDermid was unable to provide a reliable identification. Nonetheless, as the pressure mounted to find the perpetrator of this highly-publicized crime, Defendants, all members of the MPD's Homicide Unit, collaborated to fabricate a case against Haynes.

6.      McDermid's initial descriptions of the perpetrator did not match Haynes; despite this conflict and her misidentification of the filler, Defendants Mattson and Keefe, at the urging of Defendant Carlson, used improper suggestion to get McDermid to falsely identify Haynes as the shooter.

7.      Defendants Mattson, Keefe, King, and Wehr, under the supervision and influence of Defendant Carlson, also used improper suggestion and coercion to obtain a false identification of Haynes from a young teen, Ravi Seeley, who had been near the flower shop at the time of the shooting but had never clearly seen the perpetrator. Defendants Mattson, Keefe, King, and Wehr, with the full knowledge of Defendant Carlson, misrepresented the circumstances of the identifications to falsely make them appear reliable.

8.      From the day of his arrest, Haynes always maintained his innocence. Defendants Mattson and Keefe aggressively interrogated him, berating him and lying to him, insisting they had incriminating evidence which did not exist. But the 16-year-old Haynes resisted Defendants'

pressure. He repeatedly told Mattson and Keefe the truth: that he was innocent and had no information about the shooting.

9.      Having failed to pressure Haynes into making any admissions, Defendants Mattson and Keefe fabricated and coerced statements from multiple other vulnerable teens falsely implicating Haynes.

10.     After his wrongful conviction, Haynes continued to profess his innocence. In 2022, Haynes obtained assistance investigating his case from the Great North Innocence Project (GNIP). Through its investigation, GNIP uncovered substantial evidence demonstrating his innocence, including the testimony of multiple witnesses that the evidence Defendants Mattson, Keefe, King, and Wehr had obtained from them was false and the result of Defendants' misconduct.

11.     GNIP moved to vacate Haynes's convictions, and after only two days of a hearing presenting the evidence in support, the Hennepin County Attorney conceded that Haynes was entitled to this relief. On December 11, 2023, the Hennepin County District Court vacated the convictions, ruling that they were based on unconstitutionally suggestive identification procedures. That same day the charges were dismissed with prejudice, and Haynes was finally released.

12.     Marvin Haynes lost almost 20 years—his entire young adult life—wrongly imprisoned for crimes he did not commit. Now, he brings this action to address the extraordinary misconduct of Minneapolis Police Department officers David Mattson, Michael Keefe, Patrick King, Gerhard Wehr, and Michael Carlson, whose actions caused Haynes's wrongful arrest, prosecution, conviction, and incarceration.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. § 1983 and state law to remedy the

deprivation under color of law of Haynes's rights guaranteed by the United States Constitution.

This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     This Court has supplemental jurisdiction over Haynes's state law claims pursuant to 28

U.S.C. § 1367(a).

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) as the incidents at issue occurred within the

District of Minnesota.

## JURY DEMAND

16.     Haynes demands a trial by jury on all issues and claims set forth in this Complaint

pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil

Procedure 38(b).

## PARTIES

17.     Plaintiff **MARVIN HAYNES** is, and at all times relevant to this Complaint, was, a

resident of Minneapolis, Minnesota. On May 19, 2004, Haynes was wrongfully detained, and on

September 2, 2005, wrongfully convicted, of the murder of Harry Sherer and assault of Cynthia

McDermid. As a result, Haynes was wrongfully incarcerated for more than 19 years until his

convictions were vacated, all charges against him were dismissed with prejudice, and he was

released on December 11, 2023.

18.     Defendant **CITY OF MINNEAPOLIS** is a municipality in the state of Minnesota. The

City of Minneapolis, at all times relevant to this Complaint, was the employer of the individual

defendants in this matter.

19.     Defendant **DAVID MATTSON**, at all times relevant to this Complaint, was a Sergeant of

the MPD acting under color of law and within the scope of his employment pursuant to the

statutes, ordinances, regulations, policies, customs, and usage of the City of Minneapolis and the MPD. He is sued in his individual capacity.

20.     Defendant **MICHAEL KEEFE**, at all times relevant to this Complaint, was a Sergeant of the MPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Minneapolis and the MPD. He is sued in his individual capacity.

21.     Defendant **PATRICK KING**, at all times relevant to this Complaint, was a Sergeant of the MPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Minneapolis and the MPD. He is sued in his individual capacity.

22.     Defendant **GERHARD WEHR**, at all times relevant to this Complaint, was a Sergeant of the MPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Minneapolis and the MPD. He is sued in his individual capacity.

23.     Defendant **MICHAEL CARLSON**, at all times relevant to this Complaint, was a Lieutenant of the MPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Minneapolis and the MPD. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

**An unidentified Black man with short, cropped hair shoots and kills Harry Sherer.**

24.     On the morning of May 16, 2004, Harry Sherer was shot and killed while working with his sister, Cynthia McDermid, at Jerry's Flower Shop in North Minneapolis.

25.     At approximately 11:40 a.m., an unidentified Black man entered the shop and asked McDermid for an arrangement of flowers for his mother's birthday. He had short, cropped hair; spoke with clarity, as if he had an education; was significantly taller than McDermid, about 5'10" or 5'11"; and was someone McDermid had seen in the flower shop and neighborhood before.

26.     McDermid and the man engaged in small talk as she began to assemble the bouquet, and he selected a card. When McDermid quoted him a price of $45.00, he told her he would pay with his Visa card.

27.      McDermid then turned to see the man pointing a silver gun at her face; he demanded money from the back and the tapes from the store's security camera.

28.     McDermid told the man that the store had no security tapes and no money other than what was in the register. Sherer, who had by then joined McDermid and the gunman in the main area of the store, repeated that the store had no money and no safe.

29.     As the gunman shifted his aim to Sherer, McDermid ran out of the store. The gunman shot Sherer twice in the chest and the side, killing him. The gunman then fled down the alley behind the store with a hood pulled up over his head.

**Marvin Haynes is innocent of the murder of Harry Sherer.**

30.     Marvin Haynes is actually innocent of the murder of Harry Sherer; he was not present for and had no involvement in or knowledge of the crimes.

31.     Haynes was exonerated in December 2023 after the GNIP put forward substantial evidence of his innocence and the Hennepin County Attorney conceded he was entitled to relief. On December 11, 2023, the Hennepin County District Court held that Haynes's constitutional rights had been violated because the eyewitness identifications offered against him had been the

product of impermissible suggestion. The court vacated Haynes's convictions, dismissed all charges against him with prejudice, and ordered Haynes promptly released from custody.

32.     Hennepin County Attorney Mary Moriarty now acknowledges that Haynes is an innocent man who should never have been prosecuted.

33.     Haynes spent most of the day of the shooting, including throughout the late morning when the crime occurred, asleep at his mother's house—as corroborated by multiple witnesses. He did not know Sherer or McDermid, and unlike the true perpetrator who had visited the flower shop before, Haynes was not even familiar with the store.

34.     The only eyewitness to the crime itself, McDermid, provided a description of the shooter which clearly did not match Haynes. McDermid described a Black man in his early 20s with short, cropped hair, between 5'10" to 5'11"—which was several inches taller than herself at 5'6"—and weighing approximately 180 lbs. Haynes's hairstyle was markedly different; he wore a long afro at the time. He was also 5'6" tall, the same height as McDermid, and only 130 lbs. McDermid also noted that the man spoke "with clarity," as if he had an education, and did not have a "hip-hop type" of speech. That did not describe Haynes, who was only 16 years old, had not yet completed tenth grade, and had an informal manner of speech, including the heavy use of slang.

35.     No forensic or physical evidence ever tied the innocent Haynes to the crime. To the contrary, Haynes was excluded as the source of the latent fingerprints collected from the scene and believed to have been left by the perpetrator.

36.     Since the day he was arrested, Haynes has consistently proclaimed his innocence. Only 16 years old at the time, Haynes endured hours of aggressive interrogation during which Defendants Mattson and Keefe lied to him, claiming they had hard evidence implicating Haynes

in the crime. They told Haynes there was surveillance tape footage as well as fingerprint and DNA evidence proving his guilt, yet Haynes never deviated from the truth: he had no involvement in or knowledge of the shooting.

**Defendants' initial investigation fizzles out when McDermid identifies a non-suspect.**

37.     MPD investigators arrived at the scene of the shooting within minutes. Defendants Sergeant David Mattson and Sergeant Michael Keefe were assigned to lead the investigation and were supervised throughout the investigation by Lieutenant Michael Carlson. They were later assisted by Sergeants Patrick King and Gerald Wehr. Defendants, who all worked together in the Homicide Division, conferred among each other and shared information about their investigative activities throughout the investigation.

38.     Beginning with her call to 911 immediately following the shooting, McDermid provided several descriptions of the perpetrator. She described a Black man in his early 20s with short, cropped hair, who was bigger than her—between 5'10" to 5'11" tall and approximately 180 lbs. To Defendant Mattson, McDermid also reported that she had interacted with the perpetrator for several minutes before she found him pointing a gun at her face and that she had seen him four or five times before, including a couple of times in the shop. She specifically described the perpetrator's style of speech, noting he spoke with clarity, differentiating from what she called "hip-hop type speaking" and said that he "absolutely" had an education.

39.     In their initial investigation of the crime scene, MPD officers had arranged for two canine searches to trace the path of the suspect after he left the flower shop. After one canine officer reported to the scene following the call from dispatch radio, Defendant Keefe requested a bloodhound also perform a trace. Both dogs independently followed the same track and lost the scent behind a nearby apartment building at 3343 6th Street North.

40. After a canvass of residents of that apartment building, Defendants Mattson and Keefe determined that Jerry Hare most closely met the characteristics of the perpetrator as described by McDermid.

41. The same day as the shooting, Defendants Mattson and Keefe arranged for McDermid to view her first photo lineup, featuring Hare as the suspect. Although McDermid indicated Hare looked familiar from the neighborhood, she picked a filler, Max Bolden, as looking similar to the shooter.

42. Unwilling to give up on Hare despite this non-identification, Defendants Mattson and Keefe enlarged the same photo lineup and arranged for McDermid to review it again the following day.

43. McDermid again noted Hare was someone she recognized from the neighborhood. This time, McDermid identified Bolden, the same filler, as the shooter. She signed and dated the back of Bolden's photo, and included the notation, "75%-80%" indicating her confidence level in her identification.

44. In his photo, Bolden had short-cropped hair, matching McDermid's description of the shooter. Bolden did not look anything like Haynes. Based on this identification, Defendants briefly investigated Bolden as a potential suspect. They learned Bolden had been in Sioux Falls, South Dakota at the time of the shooting, which was corroborated by two witnesses. Based on that information, Defendants Mattson and Keefe eliminated Bolden as a suspect. Defendants Mattson and Keefe also eliminated Hare as a suspect, based on a confirmed alibi.

**Under mounting pressure, Defendants focus on Marvin Haynes despite the lack of evidence against him.**

45. Even as their case stalled, Defendants Mattson and Keefe faced mounting pressure to close this highly publicized murder, including from their supervisor, Defendant Carlson.

46.     At this point—and despite the absence of any reliable evidence implicating him—Defendants focused their investigation on another teen, Marvin Haynes.

47.     On May 19, 2004, three days after the shooting and at Defendant Mattson's request, Marvin Haynes was arrested on an unrelated warrant for a failure to appear in court on a misdemeanor offense.

**Defendants fabricate an identification from McDermid, who they understand is unreliable.**

48.     Defendants Mattson, Keefe, King, Wehr, and Carlson understood from Defendants' interactions with McDermid and her identification of a filler that she would not be able to provide a reliable identification of the perpetrator. But this posed a problem because McDermid was the key eyewitness. Without an identification from her, Defendants recognized it would be difficult to compile enough evidence to support a prosecution and close the murder investigation.

49.     Defendants also knew McDermid had described a shooter who did not resemble Haynes; the first two times McDermid provided a description, the descriptions were aired over MPD radio dispatch, so that all officers responding to the scene, including Defendants Mattson and Keefe, would hear them. McDermid also gave a third description of the shooter to Defendant Mattson the day following the shooting. None of her descriptions matched Haynes. And Defendants knew that the filler she had identified, Max Bolden, did not look like Haynes.

50.     Defendant Keefe specifically discussed with Defendant Carlson McDermid's unreliability as a witness and her inability to make a reliable identification. Nevertheless, Defendant Carlson instructed Defendants Keefe and Mattson to proceed to obtain an identification of Haynes.

51.     The same day that Haynes was arrested, Defendants Mattson and Keefe went to McDermid's home to conduct a third photo identification procedure. MPD guidelines required the use of double-blind identification procedures—in which the person administering the photo array does not know the identity of the suspect—precisely to eliminate the opportunity for

suggestion from the officer that could taint any eventual identification. In violation of this guideline, Defendants Mattson and Keefe conducted a non-blind identification procedure with McDermid themselves at her home (where there would be no other witnesses to the procedure). Before doing so, Mattson and Keefe ran their plan to conduct the non-blind photo identification procedure themselves at McDermid's home by their supervisor, Carlson, who gave them the green light.

52. McDermid had been traumatized by the circumstances of the crime, including the murder of her brother. She had already described the perpetrator (not resembling Haynes) and had identified two other photos (neither of whom looked like Haynes). She did not see Haynes during the crime (because he is innocent and was not there). Nor had Haynes ever come into the flower shop before. In short, McDermid had no basis to select Haynes's photo from a photo array—other than suggestion from Defendants.

53. Defendants Mattson and Keefe subsequently reported that McDermid immediately and positively identified Haynes from the array without any suggestion from them. This was a fabrication; McDermid could not and did not do so. In reality, Defendants Mattson and Keefe used improper suggestion to procure McDermid's identification of their suspect and falsely reported the circumstances of the identification procedure to make it seem reliable. Although Defendants had the capacity to tape the viewing of the photo array, they did not do so. Instead, they created a taped statement only afterwards. Defendants Mattson and Keefe suppressed the suggestion they used from the prosecutor and the defense.

### Defendants fabricate an identification from Seeley.

54. The same day as the reported identification by McDermid—May 19, 2004—Defendant Mattson met with another witness, Ravi Seeley. At the time, Seeley was 14 years old and in eighth grade; although he did not live in the North Minneapolis neighborhood where the shooting

occurred, he attended church there and had seen the perpetrator running away from the flower shop.

55.     Later that day, at the request of Defendants Mattson and Keefe, Defendants Wehr and King accompanied Mattson and Keefe to Seeley's home to conduct a photo identification procedure with Seeley.

56.     Seeley had never gotten a clear view of the perpetrator's face. He did not see Haynes during the crime (because Haynes is innocent and was not there). Nor did Seeley and Haynes otherwise know each other. In short, Seeley had no basis to select Haynes's photo from a photo array—other than suggestion from Defendants Mattson, Keefe, King, and Wehr.

57.     Defendants Mattson, Keefe, King, and Wehr subsequently reported that Seeley positively identified Haynes from the array without any suggestion from them. This was a fabrication; Seeley could not and did not do so. In reality, Defendants Mattson, Keefe, King, and/or Wehr used improper suggestion and pressure to procure Seeley's identification of their suspect and falsely reported the circumstances of the identification procedure to make it seem reliable. This included falsely reporting that Defendants Wehr and King conducted a double-blind identification procedure (as required by MPD guidelines to prevent the opportunity for suggestion) when in fact they did not. Defendants Mattson, Keefe, King, and Wehr suppressed the suggestion used to procure Seeley's identification and the fact that the procedure had not been double-blind from the prosecution and the defense.

**Defendants aggressively interrogate Haynes in an unsuccessful attempt to get him to incriminate himself.**

58.     Defendants Mattson and Keefe also interrogated the 16-year-old Haynes. Haynes truthfully accounted for his whereabouts the weekend of the shooting, including that he had been with his cousin Isiah Harper late Saturday night through early Sunday morning, and then had

been at his mother's home sleeping until about 3:00 p.m. on Sunday afternoon—well past the time of the shooting, which occurred around 11:30 a.m. Even as MPD officers aggressively interrogated him, loudly berating him, Haynes truthfully denied any knowledge about the flower shop shooting. Defendants Mattson and Keefe lied to him, telling him that they had found his fingerprints and bodily fluids containing his DNA in the shop, and that he had been captured by surveillance cameras. In reality, as Defendants all knew, no physical, forensic, or surveillance evidence ever tied Haynes to the crime, even after Mattson and Keefe searched Haynes's home and seized multiple articles of clothing which were examined and tested for blood and DNA. Defendants Mattson and Keefe also tried to get Haynes to admit that the shooting had been accidental. None of these aggressive tactics worked to obtain any admissions; Haynes steadfastly asserted his innocence.

59.     Despite the lack of evidence, based solely on the unreliable and fabricated photo identifications, Defendants Mattson and Keefe arrested Haynes for murder after this interview.

60.     That same night, Defendants Mattson and Keefe, conducted an aggressive nighttime search of Haynes's home. Consistent with Haynes's innocence, the thorough search found no evidence implicating him in the crimes.

61.     Defendants Keefe and Mattson later reported that while at Haynes's home, Keefe spoke to Haynes's mother and three sisters and that none could corroborate his alibi. This report was a fabrication. Haynes was home at the time of the flower shop shooting—as his family would later attest—and his family members did not tell Defendants differently.

**Defendants conceal evidence undermining the witness identifications.**

62.     Under pressure from Defendant Carlson, Defendants Mattson and Keefe decided to present an in-person lineup involving Haynes to both McDermid and Seeley the very next day, on May 20, 2004.

63.     Defendants, including Mattson, Keefe and Carlson, knew from Defendants' interactions with McDermid and Seeley that the witnesses could not make reliable identifications. They also knew that by presenting an in-person lineup where Haynes was the only person repeated from the photo lineup, the witnesses would be likely to identify him solely because they had recently seen his photo. Nevertheless, after discussion, Defendant Carlson instructed Defendants Mattson and Keefe to proceed with the in-person lineup. Unlike the photo identification procedures (which were witnessed solely by Defendants), a third party, Haynes's lawyer, was present for the in-person lineups.

64.     If McDermid had actually made an immediate and positive identification of Haynes from the photo array the day before without any suggestion, as Defendants Mattson and Keefe claimed she did, she would be expected to do the same the following day at the in-person lineup. Instead, when she first viewed the in-person lineup, McDermid only gestured towards Haynes and said that "looks like him." She then asked to view the entire lineup a second time. During the second viewing, McDermid stated that she was having problems concentrating, was traumatized and upset, and felt she was blending the people all together. She did not make a positive identification.

65.     Similarly, if Seeley had actually made a positive identification of Haynes from the photo array the day before without any suggestion, as Defendants Mattson, Keefe, King, and Wehr claimed he did, he would be expected to make another immediate positive identification at the

in-person lineup. Instead, Seeley only said Haynes "looks like" the person he saw. He then immediately whispered to Mattson that he wasn't sure (out of the hearing of the third-party witnesses). Defendants Mattson and Keefe misrepresented the circumstances of Seeley's alleged identification during the in-person lineup, including by hiding that Seeley had expressed uncertainty.

**Defendants coerce and fabricate false inculpatory statements from vulnerable teens.**

66.     With only two unreliable identifications as evidence, Defendants, including Mattson, Keefe, and Carlson, knew they needed more to secure Haynes's conviction.

67.     Defendants Mattson and Keefe repeatedly and aggressively interrogated Haynes's 14-year-old cousin, Isiah Harper, without his mother or a lawyer present. Harper initially told Defendants the truth—that he did not know anything about the murder and had no information incriminating Haynes. But Mattson and Keefe would not accept that answer. They continued to pressure Harper to provide evidence against Haynes. They aggressively interrogated Harper, put him in a jail cell and in a holding tank with adult men, and threatened him with extensive prison time if he did not tell them what they wanted to hear.

68.     The 14-year-old Harper, who had never before been interviewed by law enforcement, finally acquiesced to this pressure. But because he did not actually know anything about the murder or have any information incriminating Haynes, Defendants, including Mattson, had to tell him what to say.

69.     Ultimately, on May 28, 2004, Defendants Mattson and Keefe obtained a coerced and fabricated taped statement from Harper claiming that he had been with Haynes on the morning of the shooting at their friend Muffy's house when Haynes had said he was going to "hit a lick," *i.e.*, rob someone. Harper also said that Haynes had called him later that day and told him that

Haynes had shot a white man because the man wouldn't give him any money. None of this was true; Haynes is innocent of the flower shop murder and never made any statements to Harper suggesting otherwise.

70.    Defendants Mattson and Keefe misrepresented the circumstances of their interactions with Harper, failing to report the initial interviews in which Harper had repeatedly told them he did not have any information, the pressure they used to coerce Harper into providing the statement they wanted, or that they fed him the information he reported inculpating Haynes. To the contrary, Defendants Mattson and Keefe misrepresented to the prosecutor that Harper had volunteered the specific information he offered incriminating Haynes.

71.    After he was out of police custody, Harper attempted to disclaim the coerced and fabricated statement. He initially refused to appear at the grand jury, coming only because Defendant Mattson arrested him on a bench warrant. Harper then initially testified (truthfully) that the taped statement was just what the police told him to say and that he did not know anything about the murder. But when repeatedly confronted with the fabricated taped statement, Harper again eventually acquiesced to the pressure.

72.    Based on the coerced and fabricated evidence from Harper, as well as the fabricated identifications from McDermid and Seeley, Haynes was indicted on June 10, 2004.

**As trial approaches, Defendants recognize the case is weak and exert more pressure to try to drum up incriminating evidence.**

73.    Haynes was initially scheduled to be tried beginning October 11, 2004. As the prosecutor and Defendants understood, including Defendants Mattson, Keefe, and Carlson, the evidence against Haynes was weak. In particular, no physical or forensic evidence incriminated Haynes at all. Even with Defendants Mattson, Keefe, King, Wehr, and Carlson's misrepresentations about the identification procedures, intended to make the identifications seem more reliable, the

16

identifications from McDermid and Seeley were substantially impeachable. And Harper was insisting he would not testify to what was in the taped statement Defendants Mattson and Keefe had obtained from him.

74.     In an attempt to shore up the case, Defendants Mattson and Keefe used the same tactics they had used with Harper with another 14-year-old, Anthony Todd. Todd was a neighborhood friend of Harper's, identified in Harper's fabricated and coerced statement as also present on the morning of the shooting at their friend Muffy's house when Haynes allegedly made incriminating admissions. However, despite Mattson and Keefe's threats that Todd would be charged himself if he did not provide a statement corroborating the one from Harper, Todd truthfully reported he had no information incriminating Haynes.

75.     Eventually, however, Defendant Keefe interrogated Todd for a second time, this time while he was in custody at a boy's camp, and Todd bowed to Defendants' pressure. On October 13, 2004—during jury selection for the first scheduled trial—Defendant Keefe obtained a taped statement from Todd falsely implicating Haynes, repeating what Defendants, including Keefe, had told him to say. The coerced and fabricated statement claimed that Todd, too, had heard Haynes say he was going to "hit a lick" the morning of May 16, 2004, and that he had falsely denied this earlier out of fear of Haynes. None of this was true; Haynes is innocent of the flower shop murder and never made any statements to Todd suggesting otherwise.

76.     The pressure to find more evidence supporting the prosecution continued. On October 18, 2004, after the jury had been selected, the prosecution sought a three-day continuance to permit DNA testing on Haynes's jacket. Although the continuance was granted, consistent with his innocence, the testing did not incriminate Haynes in any way.

77.     During this brief continuance on the eve of trial, Defendant Keefe used improper means to obtain false incriminating statements from multiple other vulnerable and unreliable teen witnesses. But because these witnesses had never before been disclosed, the trial court excluded their testimony.

78.     The prosecution appealed this exclusion, arguing that the rest of the evidence implicating Haynes was substantially impeachable and it was uncertain whether the earlier disclosed witnesses (*i.e.* McDermid, Seeley, Harper, and Todd) would testify at trial consistent with the incriminating statements Defendants Mattson, Keefe, King, and Wehr had reported obtaining from them. Due to the appeal, the trial was delayed.

**Haynes is convicted based on false and coerced testimony.**

79.     After the appeal, Haynes's trial was reset for August 2005.

80.     The case remained exceptionally weak, resting on the unreliable misidentifications from McDermid and Seeley (which were the product of Defendants Mattson, Keefe, King, and Wehr's suggestion and coercion, urged by Defendant Carlson, and shored up by misrepresentations from Defendants about how they were obtained) and coerced and fabricated statements Defendants Mattson and Keefe obtained from juvenile witnesses including Harper and Todd. No physical or forensic evidence implicated Haynes.

81.     McDermid identified Haynes in court, as a result of Defendants Mattson and Keefe's suggestion during the police investigation. Despite the identification, the prosecution had to admit that her initial description did not match Haynes and that she had earlier identified a filler.

82.     During trial, Seeley truthfully testified he had doubts about his identification and that during the live lineup he had told one of the officers he was "kind of shaky" on and not sure of the identification. The prosecution disputed Seeley's account with evidence from Defendant

Mattson denying this had occurred. It also introduced evidence of Seeley's prior photo identification and argued the jury should rely on that, rather than his testimony in court.

83.    During his trial testimony, Harper attempted to tell the truth. Harper testified he had been threatened into making his previous statements, and that they were not true. But based on Defendants Mattson and Keefe's misrepresentations, the prosecutor believed Harper was falsely disclaiming his earlier statement to avoid implicating his cousin. During a break in his testimony, Harper was threatened with criminal charges if he did not testify consistently with the taped statement Mattson and Keefe had obtained from him. In tears, Harper capitulated to this pressure. But on cross-examination, he again told the truth, reiterating that he had been threatened by Defendants, that they told him what to say in his statement, and that the statement was not true. The prosecution relied on the coerced and fabricated taped statement Defendants Mattson and Keefe had taken from Harper, which was admitted into evidence.

84.    The prosecution was permitted to introduce evidence from the teen witnesses Defendant Keefe had identified on the eve of the first scheduled trial. Although on appeal the prosecution had argued based on Defendant Keefe's representations that this testimony was qualitatively superior to any of the other incriminating evidence, in reality it was incredibly weak on its face. One of the witnesses, a runaway first interviewed while in custody at a juvenile detention center, claimed she had heard Haynes brag about the shooting. This was not true—Haynes is innocent of the flower shop murder and never told anyone he had committed it. Although the witness claimed she knew Haynes, she could not identify him in court, and when she attempted to identify the house where she had heard this incriminating conversation, she identified the home of a *different* Marvin, Marvin Miller. And while prosecutors had claimed on appeal that a second witness would also provide key inculpatory evidence, she ultimately did not testify at the trial.

19

This second witness would later disclose during post-conviction proceedings that she was pressured by Defendant Keefe to implicate Haynes and she never thought he had anything to do with the flower shop murder.

85.     Haynes testified in his own defense, truthfully asserting his innocence and explaining that he had been out the night before the shooting until about 2:00 a.m. and was in bed until about 3:00 p.m. on the day of the murder. Haynes also truthfully denied making the inculpatory statements Defendants Mattson and Keefe had pressured witnesses into attributing to him: he denied ever saying he was going to "hit a lick" or commit a robbery, and he denied telling anyone he shot a white man.

86.     Although the prosecution acknowledged that several of its witnesses were "terrible" witnesses, it relied heavily on Defendants Mattson, Keefe, King, and Wehr's fabricated reports and misrepresentations about the identification procedures as evidence they were reliable. The prosecution argued that given the lack of any suggestion, McDermid and Seeley would not have each independently positively identified Haynes from the photo array—as Defendants Mattson, Keefe, King, and Wehr claimed they had—if he were not the shooter. The prosecution also argued Harper's initial taped statement should be believed because it included details about the crime, demonstrating its reliability. Defendants Mattson and Keefe hid the fact that they had fed Harper details of the crime from the prosecution and the defense.

87.     Based on the fabricated evidence and misrepresentations from Defendants Mattson, Keefe, King, and Wehr, created under the direction and approval of Defendant Carlson, and without the exculpatory evidence they suppressed, Haynes was convicted of murder in the first degree and assault in the second degree on September 2, 2005, and subsequently sentenced to life in prison.

**Almost 20 years after his arrest, Haynes is exonerated.**

88.     In 2022, after years of unsuccessful attempts to prove his innocence, Haynes received assistance from the Great North Innocence Project. Through its investigation, GNIP uncovered substantial evidence demonstrating Haynes's innocence.

89.     Among other evidence, GNIP obtained key admissions from Seeley that he never had any confidence that Haynes was the person he saw because he had not had a clear view of the perpetrator's face and that he had felt pressured by the investigating officers to make an identification and stick with it. Seeley also explained that he was uncertain of his identifications during the photo lineup and the live lineup.

90.     Two of the other juvenile witnesses who purportedly heard Haynes make incriminating statements, Isiah Harper and Anthony Todd, also came forward with truthful statements supporting Haynes's innocence. Harper provided an affidavit stating that MPD officers pressured him into making incriminating statements against Haynes. They repeatedly threatened him with criminal charges if he did not cooperate and said he could get half the prison times Haynes was facing. As a 14-year-old, Harper was scared and felt he had no choice but to tell officers what they wanted to hear. The truth, however, is that Harper never heard Haynes make any incriminating statements either before or after the murder of Harry Sherer.

91.     Todd also admitted that his trial testimony against Haynes had been false. Like Harper, Todd stated that the investigating officers had threatened him with criminal charges if he refused to cooperate and coerced him into falsely incriminating Haynes at trial. In truth, however, Todd never heard Haynes say he was going to "hit a lick," or any such statement.

92.     Four of Haynes's sisters also provided affidavits supporting Haynes's alibi—that he was asleep at their mother's house when the crime occurred. Their affidavits also demonstrate the

falsity of Harper and Todd's fabricated statements: as Haynes was not even at Muffy's at the time that the fabricated statements claimed he was making admissions to Harper and Todd; instead, he was home with his sisters during that time.

93.     GNIP sought to vacate Haynes's convictions based on this new evidence of innocence and because his convictions relied on constitutionally defective and unreliable eyewitness identification evidence which was the result of highly suggestive identification techniques.

94.     On November 27 and 28, 2023, the Hennepin County District Court held the first two days of a postconviction evidentiary hearing, during which Haynes put on his case. Following these two days, the State agreed that Haynes had satisfied his burden of proof to establish that his convictions should be vacated, and that the interests of justice would be served by dismissing all charges against him with prejudice.

95.     On December 11, 2023, Hennepin County District Court, the Honorable William H. Koch presiding, vacated Haynes's convictions for first-degree murder and second-degree assault, dismissed all criminal charges against Haynes with prejudice, and ordered Haynes promptly released from state custody.

96.     Hennepin County Attorney Mary Moriarty called Haynes's prosecution a "terrible injustice" and "egregious," described reading the police files as "chilling," and said, "there was no reason the Hennepin County Attorney at the time…should have allowed prosecution of the then 16-year old." Moriarty apologized to Haynes for the fact that he "lost the opportunity to graduate from high school, attend prom, have relationships, attend weddings and funerals, and be with your family during holidays."

97.     Marvin Haynes spent nearly 20 years—from the age of 16 until the age of 36—wrongly incarcerated. In all, Haynes spent 7,146 days in Minnesota state jails and prisons, including 6,675 days following his wrongful conviction, for crimes he did not commit.

## DAMAGES

98.     Defendants' unlawful actions caused Marvin Haynes to spend nearly 20 years, including the end of his childhood and all of his young adulthood, incarcerated for a crime he did not commit. His incarceration began when he was just 16 years old, and he was thrust immediately into life-threatening conditions in adult prison. Haynes lost the opportunity to develop as a teenager, to spend those formative years building a sense of self and a vision for adulthood while a part of his community. Instead, Haynes spent his days worrying about his safety and fighting to prove his innocence, isolated from the people who cared for him, and forced every day to confront the terror of carrying a life sentence for a crime he did not commit. During his wrongful incarceration, Haynes lost the opportunity to graduate high school alongside his peers, to see his maternal grandparents—with whom he had a close relationship—before they passed away, and to spend valuable years with his mother before a stroke rendered her unable to speak or care for herself. And although Mr. Haynes grew up in a tight-knit family as one of seven children, his wrongful conviction left deep wounds from which his family has only now started to heal.

99.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Haynes sustained injuries and damages, including but not limited to the following: loss of freedom; pain and suffering; physical injuries; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; loss of income; and restrictions on all forms of personal freedom

including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

100.    The emotional pain and suffering caused by losing formative years of his life has been substantial. During his incarceration, Haynes was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Haynes missed out on the ability to attend prom and graduate high school with his peers; share holidays, births, funerals, and other life events with loved ones; and the fundamental freedom to live his life as an autonomous human being.

101.    As a direct result of his unjust conviction and imprisonment, many of the effects of these harms continue to this day and will continue into the future.

## CAUSES OF ACTION

### COUNT I:
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law
and Denial of a Fair Trial by Fabricating Evidence, Withholding Material
Exculpatory and Impeachment Evidence, Conducting Impermissibly Suggestive
Identification Procedures, and Conducting a Reckless Investigation**
*Against Individual Defendants Mattson, Keefe, King, Wehr, and Carlson.*

102.    Plaintiff Haynes incorporates by reference each of the allegations in paragraphs 1 through 101 and further alleges as follows:

103.    Defendants Mattson, Keefe, King, Wehr, and Carlson (Individual Defendants), individually and in concert, fabricated false evidence of Haynes's guilt, thereby violating his right to a fair trial and causing him to be deprived of his liberty without due process of law. This included, without limitation, making false written and verbal reports to the prosecutor, and coaching and manipulating witnesses to supply false evidence and testimony. Defendants knowingly caused this false evidence to be used against Haynes in his prosecution and at trial.

104.     The Individual Defendants also, individually and in concert, violated Plaintiff's due process rights to a fair trial by concealing and suppressing exculpatory and impeachment evidence as a part of a scheme to deliberately deceive the court in violation of the Constitution, *Brady v. Maryland*, 373 U.S. 83 (1963), its progeny, and related cases.

105.     The Individual Defendants also, individually and in concert, violated Plaintiff's due process rights to a fair trial by using impermissibly suggestive identification procedures to create unreliable identifications which were offered against Haynes in his prosecution and at trial.

106.     The Individual Defendants also, individually and in concert, violated Plaintiff's due process rights to a fair trial by intentionally or recklessly conducting an inadequate investigation in a manner that shocks the conscience, including by coercing and threatening witnesses, purposefully ignoring evidence of Plaintiff's innocence, and using systematic pressure with witnesses to implicate Plaintiff despite contrary evidence.

107.     The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Haynes's federally protected rights. These acts were perpetrated while the Individual Defendants were acting in their official capacities under color of state law. No reasonable officer in 2004 would have believed this conduct was lawful.

108.     The Individual Defendants not only lied at trial and created false written and verbal reports, they also concealed the leading, suggestive, reckless and improper tactics used on their witnesses.

109.     Had the Individual Defendants' fabrications and/or the material exculpatory and impeachment evidence known to them been disclosed, this evidence would have tended to prove Haynes's innocence and cast doubt on the entire prosecution.

110.     As a direct and proximate result of the Individual Defendants' actions, Haynes was wrongfully prosecuted, detained, and incarcerated for nearly 20 years and suffered the other grievous injuries and damages set forth above.

**COUNT II:**
**42 U.S.C. § 1983 Malicious Prosecution in Violation of**
**the Fourth and Fourteenth Amendments**
*Against Individual Defendants Mattson, Keefe, King, Wehr, and Carlson.*

111.     Plaintiff Haynes incorporates by reference each of the allegations in paragraphs 1 through 101 and further alleges as follows:

112.     The Individual Defendants acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Haynes for murder in the first degree and assault in the second degree, intentionally caused Haynes to be arrested, charged, and prosecuted for those crimes, without any reasonable belief in Haynes's guilt, thereby violating Haynes's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of prosecution absent probable cause.

113.     Haynes is completely innocent of these crimes. As the Individual Defendants knew, the sole basis for the criminal action against Haynes was the false identification of Haynes by McDermid and Seeley, along with other evidence fabricated by Defendants. In addition, Defendants understood that Haynes could not have committed these crimes because he did not match the description of the perpetrator and had an alibi. Through their unconstitutional misconduct, described above, Defendants caused the baseless proceedings against Haynes in violation of his constitutional rights.

114.     The Individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Haynes's

clearly established constitutional rights. No reasonable officer in 2004 would have believed this conduct was lawful.

115.    The prosecution finally terminated in Haynes's favor on December 11, 2023, when the convictions were vacated and all charges were dismissed.

116.    As a direct and proximate result of the Individual Defendants' actions, Haynes was wrongfully prosecuted, detained, and incarcerated for nearly 20 years and suffered the other grievous injuries and damages set forth above.

**COUNT III:**
**42 U.S.C. § 1983 Civil Rights Conspiracy**
*Against Individual Defendants Mattson, Keefe, King, Wehr, and Carlson.*

117.    Plaintiff Haynes incorporates by reference each of the allegations in paragraphs 1 through 101 and further alleges as follows:

118.    The Individual Defendants, along with witnesses they prevailed upon to offer false evidence and others yet unknown, agreed among themselves to act in concert to deprive Haynes of his clearly established constitutional rights as protected by the Fourth and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law.

119.    The acts and omissions by the Individual Defendants described in the preceding paragraphs were the direct and proximate cause of Haynes's injuries. These Defendants all knew, or should have known, that their conduct would result in Haynes's wrongful arrest, prosecution, conviction, and incarceration. No reasonable officer in 2004 would have believed this conduct was lawful.

120.    As a direct and proximate result of the Individual Defendants' overt acts, Haynes was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for nearly 20 years; and subjected to other grievous injuries and damages as set forth above.

## COUNT IV:
## 42 U.S.C. § 1983 Supervisory Liability Claim
*Against Individual Defendant Carlson.*

121.    Plaintiff Haynes incorporates by reference each of the allegations in paragraphs 1 through 101 and further alleges as follows:

122.    Haynes's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration were caused by the unconstitutional action and inaction of Defendant Carlson acting in his individual capacity and under color of law.

123.    Defendant Carlson directly participated in the misconduct that resulted in Haynes's wrongful conviction. Specifically, Defendant Carlson directed, approved, and/or acquiesced to the use of impermissible suggestion to obtain unreliable identifications, and to reports containing fabricated evidence. Defendant Carlson knew that the evidence implicating Haynes was unreliable and/or false, and that any identification was only the result of impermissible suggestion and leading by the other Individual Defendants.

124.    Defendant Carlson knowingly refused to terminate the wrongful prosecution of Haynes, which, upon information and belief, he knew or should have known had been initiated based on fabricated evidence and in spite of suppressed exculpatory information. As a result, Defendant Carlson knew or reasonably should have known that Haynes's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated. No reasonable officer in 2004 would have believed this conduct was lawful.

125.    Defendant Carlson culpably failed to adequately train, supervise, discipline, and/or control his subordinates, including Defendants Mattson, Keefe, King, and Wehr, who ignored evidence suggesting Haynes's innocence, fabricated evidence through suggestion and coercion, and suppressed exculpatory information.

126.     Defendant Carlson violated Haynes's constitutional rights by acquiescing in the deprivation of Haynes's constitutional rights by his subordinates, and by generally showing a reckless or callous indifference to Haynes's rights.

127.     Defendant Carlson's failure to train, supervise, discipline and/or control his subordinates, his indifference to the actions of his subordinates, and his indifference to Haynes's rights, encouraged and permitted his subordinates to fabricate and coerce evidence, fail to document and disclose exculpatory evidence, and ignore evidence suggesting Haynes's innocence.

128.     The actions and omissions of Defendant Carlson caused Haynes to suffer constitutional deprivations and grievous personal injuries and damages described above.

**COUNT V:**
**Malicious Prosecution under Minnesota State Law**
*Against Individual Defendants Mattson, Keefe, King, Wehr, and Carlson*
*and the City of Minneapolis.*

129.     Plaintiff Haynes incorporates by reference each of the allegations in paragraphs 1 through 101 and further alleges as follows:

130.     Defendants Mattson, Keefe, King, Wehr, and Carlson, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously, and without probable cause, legal justification, or reasonable belief in his guilt, cause Haynes to be detained and prosecuted for the murder of Harry Sherer and assault of Cynthia McDermid.

131.     Based on the totality of the evidence—including Haynes's failure to match the description of the perpetrator, his alibi, his exclusion as the source of fingerprints believed to have been left by the perpetrator, and a lack of any inculpatory physical or forensic evidence or reliable witness testimony, the Individual Defendants knew, or should have known, that a reasonable and prudent individual in their position could not conclude that the evidence constituted probable cause to charge Haynes. Nevertheless, without probable cause, the

Individual Defendants caused the commencement of prosecution against Haynes, including through the use of fabricated evidence. The Individual Defendants' conduct was actuated without any proper motive and with malice because the Individual Defendants intentionally committed acts they had reason to believe were legally prohibited.

132.    Almost 20 years after the Individual Defendants maliciously caused the commencement of a false prosecution against Haynes, the proceedings were terminated in Haynes's favor through his exoneration on December 11, 2023, when the Honorable William H. Koch of the Fourth Judicial District, Hennepin County District Court vacated Haynes's conviction. Haynes was released from prison over 20 years after he was arrested for a crime he did not commit, and all charges against him were dismissed with prejudice.

133.    As a direct and proximate result of the Individual Defendants' malicious prosecution of Haynes, Haynes was wrongfully detained, prosecuted, convicted, and incarcerated, served more than 20 years for crimes he did not commit, and suffered the physical, emotional, and pecuniary damages as described above.

134.    The City of Minneapolis is responsible for the actions of its employees taken within the scope of their employment under the principle of *respondeat superior*.

**COUNT VI:**
**Intentional, Reckless, and/or Negligent Infliction of Emotional Distress under Minnesota State Law**
*Against Individual Defendants Mattson, Keefe, King, Wehr, and Carlson*
*and the City of Minneapolis.*

135.    Plaintiff Haynes incorporates by reference each of the allegations in paragraphs 1 through 101 and further alleges as follows:

136.    The Individual Defendants, acting separately and in concert, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Haynes's rights, engage in extreme and outrageous conduct in connection with the unlawful prosecution of Haynes,

including without limitation: fabricating evidence against Haynes, suppressing exculpatory evidence, and ignoring evidence of Haynes's innocence.

137.    The Individual Defendants, knowing that Haynes was innocent of the crimes, acted only to cause him extreme emotional distress, and in fact did cause Haynes severe emotional distress that resulted in bodily harm.

138.    The Individual Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

139.    Alternatively, the Individual Defendants, acting separately and in concert, realized or should have realized that their conduct involved an unreasonable risk of causing distress to Haynes.

140.    As a direct and proximate result of the Individual Defendants' joint and several extreme and outrageous behavior, Haynes was wrongfully prosecuted, convicted, incarcerated, served almost 20 years, and suffered severe emotional distress for which he is entitled to damages.

141.    The City of Minneapolis is responsible for the actions of its employees taken within the scope of their employment under the principle of *respondeat superior*.

## COUNT VII:
### Indemnification
*Against the City of Minneapolis.*

142.    Plaintiff Haynes incorporates by reference each of the allegations in paragraphs 1 through 101 and further alleges as follows:

143.    Pursuant to Minn. Stat. § 466.07, public entities must pay any tort judgment for damages for which employees are liable for acts committed within the scope of their employment.

144.    Defendants Mattson, Keefe, King, Wehr, and Carlson were, at all relevant times, employed by the City of Minneapolis, and committed all acts alleged above in the scope of their

employment and/or as agents for the City of Minneapolis. Therefore, the City of Minneapolis is liable for any resulting damages against the Individual Defendants, including the award of attorneys' fees.

**WHEREFORE,** Plaintiff Marvin Haynes prays as follows:

a.  That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.  That the Court award punitive damages to Plaintiff, and against all individual Defendants, in their individual capacity, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

c.  For a trial by jury;

d.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.  For any and all other relief to which Plaintiff may be entitled.

Dated: February 12, 2025

By: /s/ Oliver E. Nelson III
Oliver Nelson, III, MN Bar No. 0347280
Minnesota Bar No. 0347280
Magna Law Firm, LLC
2915 Wayzata Blvd.
Minneapolis, MN 55405
(612) 767-1871
onelson@magnalaw.net

Emma Freudenberger, NY Bar No. 4624045*
Amelia Green, NY Bar No. 5428412*
Sophia Villarreal, NY Bar No. 6065775*
Katrina Rogachevsky, NY Bar No. 5614532*
Neufeld Scheck Brustin Hoffmann &
Freudenberger, LLP
200 Varick Street, Suite 800
New York, NY 10014
(212) 965-9081
emma@nsbhf.com

amelia@nsbhf.com
sophia@nsbhf.com
katrina@nsbhf.com

\* *Applications to practice* pro hac vice *forthcoming*

*Counsel for Plaintiff Marvin Haynes*